**Kathryn MICKELSON–WURM, Plaintiff—Appellant,**

v.

**COMMISSIONER SOCIAL SECURITY ADMINISTRATION, Defendant— Appellee.**

No. 06–35550.

United States Court of Appeals, Ninth Circuit.

Submitted July 11, 2008.

Filed July 21, 2008.

Alan R. Unkeles, Alan R. Unkeles, PC, Beaverton, OR, for Plaintiff–Appellant.

Neil J. Evans, Esq., Craig J. Casey, Esq., USPO–Office of the U.S. Attorney, Mark O. Hatfield, Jeffrey H. Baird, Esq., Portland, OR, Michael McGaughran, Esq., Social Security Administration Office of the General Counsel, Seattle, WA, for Defendant–Appellee.

Before: SCHROEDER and PREGERSON, Circuit Judges, and STROM *, District Judge.

* The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

484

## MEMORANDUM **

Appellant Kathryn Mickelson–Wurm appeals from a final decision of the district court, which affirmed the Social Security Commissioner's ("Commissioner") decision denying her claim for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") benefits. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Kathryn Mickelson–Wurm is a nurse with twenty-five years of past relevant work experience as a registered nurse, charge nurse, and director of nursing. The medical evidence in the record reveals that Mickelson–Wurm's November 2000 surgery resulted in a post-operative diagnosis that she could perform a significant number of jobs in the regional and national economies (utilization review contractor nurse, other nursing work, and nurse recruiter).

On April 17, 2000, Dr. Cheryl Tidball, her treating physician, made the following notes regarding Mickelson–Wurm's condition: "marked spasm at lower thoracic and upper lumbar on the right, negative SLR (straight leg raising) and low back pain with radiculopathy." Dr. Tidball also noted administering treatment with medicines including flexaril and Vicodin. *Id.* Dr. Julio Ordonez, a neurosurgeon who saw Mickelson–Wurm on November 6, 2000, three weeks before her surgery, observed "bilateral muscle spasms, right-sided weakness on toe walking," and a "Lasegue's maneuver [that] was positive on the right and negative on the left." *Id.*

On November 27, 2000, Mickelson–Wurm underwent magnetic imaging of the lumbar spine to address her chronic back pain. The imaging revealed degenerative disc disease at L4 and degenerative facet disease at L5–S1. On November 30, 2000, Mickelson–Wurm underwent lumbar fusion surgery.

On both December 4, 2000 and January 10, 2001, Dr. Ordonez, the neurosurgeon who had seen Mickelson–Wurm for a physical and history before surgery, determined that the fusion left Mickelson–Wurm "stable and with no further progression of her spondylolisthesis." She was diagnosed as having normal station and gait, and normal range of motion, with no significant pain or functional limitations. She was given Zoloft for her depression; the medication was effective.

On October 5, 2001, Mickelson–Wurm again complained of back pain. She obtained a new patient comprehensive history and physical with Dr. Robert G. Sayson, who noted that she had "a lot of low back pains and tenderness" and that she "[could not] lie flat on [her] back due to [a] protruding tailbone with some tingling in [the] feet and pains in [the] shins." Bl. Br. 4.

On December 6, 2001, Mickelson–Wurm filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g), alleging a disability beginning in July 1, 2000.

In March 2002, State Agency physicians determined that Mickelson–Wurm's alleged affective disorder was not severe, and that it imposed, at most, only mild limitations. In evaluating her physical Residual Functional Capacity (RFC), physicians determined that Mickelson–Wurm could perform sedentary work. On December 31, 2002, the physicians again arrived at the same conclusion.

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

After her initial claim was denied, Mickelson–Wurm requested and received a hearing, which took place on December 10, 2003. There, Mickelson–Wurm testified that despite the surgery, she was unable to work due to disabling back pain. On January 30, 2004, the ALJ found that Mickelson–Wurm did not qualify as disabled. Her request for administrative review was denied, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 422.210. On April 5, 2006, the district court affirmed and, on June 5, 2006, Mickelson–Wurm timely appealed.

Over the course of her career, Mickelson–Wurm acquired a broad set of nursing-related skills. As a director of nursing, she interviewed candidates, taught aides how to take blood pressure readings and "do[ ] blood sugars," taught medical charting, and wrote up disciplinary advice for the administrator. As a circulating nurse, Mickelson–Wurm acquired surgical experience and learned how to set up instruments for a surgery. She supervised other nurses and ensured that their medication sheets were correct. In her position as a nurse for Community Homes, a facility for bedridden patients, Mickelson–Wurm did intubation feedings and set-up IVs. The job required her to lift up to seventy-five pounds. During her career, Mickelson–Wurm also set up an Alzheimer's wing at a hospital.

As to her computer capabilities, Mickelson–Wurm testified that she had done no computer course work and had never performed any job requiring her to use computer systems or software. She testified that she posted lab values, and that she usually assigned keyboarding tasks to others. Despite this testimony, Mickelson–Wurm believed that she needed computer skills to remain in nursing.

Mickelson–Wurm asserted that the pain limited her ability to sit, stand, or walk for more than thirty minutes at a time, and that it affected her concentration. The ALJ found this testimony to be inconsistent with Mickelson–Wurm's reports to doctors, the opinions of her treating physician, and her daily activities.

In addition to Mickelson–Wurm's testimony, the ALJ cited the testimony of a vocational expert, Susan Berkett, to evaluate petitioner's claims. Berkett reviewed the record and listened to Mickelson–Wurm's testimony. The ALJ asked Berkett to consider the following hypothetical patient: a forty-eight year old individual with twenty-five years of nursing experience who can lift a maximum of ten pounds; who can walk no more than thirty minutes at one time, not to exceed two hours total in a workday; and who can occasionally engage in climbing, stooping, kneeling, crouching or crawling. When asked whether, with these limitations in mind, such an individual could perform Mickelson–Wurm's past relevant work or other work in the national economy, Berkett replied that such an individual could not work in Mickelson–Wurm's past relevant work, but could work as a nurse recruiter or utilization review contractor nurse. Berkett further testified that Mickelson–Wurm had learned to read medical files and understand medical terminology, developed supervisory and coordination skills, interacted professionally with insurance companies and physicians, and developed expertise in coordinating medical facilities, reviewing applications of nursing applicants, and interpreting the work histories of nursing applicants. In addition, Berkett testified that in Oregon, there are approximately 2,000 utilization review contractor nurses, and approximately 2,000,000 total nursing jobs in the national economy.

Mickelson–Wurm argues that the ALJ erred in accepting Berkett's vocational ex-

**486**

pert testimony concerning her transferable skills, available job base, and analysis of the Dictionary of Occupational Titles.

■ First, the ALJ did not err in failing to identify Mickelson–Wurm's transferable skills. The testimony of a qualified vocational expert concerning a claimant's skill development constitutes substantial evidence. See *Osenbrock v. Apfel*, 240 F.3d 1157, 1163 (9th Cir.2001). Although the ALJ did not explicitly identify each of Mickelson–Wurm's transferable skills, it did adopt Berkett's thoroughly descriptive testimony. That testimony constituted substantial evidence that Mickelson–Wurm had developed a set of highly marketable, readily transferable skills because it was comprehensive, premised upon the expert's specific field experiences, and was readily available to any reviewer of the record. Berkett's conclusions that an individual with Mickelson–Wurm's education and work experience possessed skills that would transfer to the occupations of nurse recruiter and utilization review contractor nurse were adequately supported by "inferences reasonably drawn from the record," and were therefore properly upheld. *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1193 (9th Cir.2004).

Mickelson–Wurm also contends that the Commissioner erred as a matter of law by not resolving the conflict between Berkett's vocational expert testimony and other sources, as required by Social Security Ruling ("SSR") 00–4p.

SSR 00–4p requires an ALJ to provide a reasonable explanation for any conflicts between occupational evidence furnished by a vocational expert and information in the DOT. The ALJ must clarify the discrepancy in the opinion *only where there is an apparent unresolved conflict* that arises between the vocational expert's testimony and the DOT. "An ALJ may rely on expert testimony which contradicts the DOT [so long as] the record contains persuasive evidence to support the deviation." *Johnson v. Shalala*, 60 F.3d 1428, 1435–36 (9th Cir.1995).

■ Here, the district court correctly concluded that the conflict in testimony between the vocational expert and the DOT had been adequately resolved. Berkett testified that an individual, such as Mickelson–Wurm, who was limited to sedentary work, could perform the position of a utilization review contractor nurse. Even though the DOT listed that position as one of light exertion, Berkett adequately distinguished the information contained in the DOT on grounds of her own professional experience phoning hospitals and clinics. Berkett testified that the primary task of a utilization review contractor nurse is sedentary in character: to sit and view files all day and coordinate information with insurance companies, physicians and hospitals. She described the duties required and the skills performed by a person in that position, and explained how a person with Mickelson–Wurm's experience and limitations could perform the position.

The district court correctly held that the ALJ's express reliance on Berkett's testimony—which constituted persuasive evidence to support the finding that Mickelson–Wurm could perform the position of utilization review contractor nurse—was proper.

■ Lastly, Mickelson–Wurm contests the ALJ's finding that there is a "significant number" of jobs in the national economy which she can perform. We have previously held that between 1,000 and 1,500 jobs in the regional economy constitutes a significant number for purposes of the meaning of the Social Security Act. *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir.1999); *see also Barker v. Secretary of*

*Health and Human Services,* 882 F.2d 1474, 1479 (9th Cir.1989) (1,266 jobs in regional economy constitutes significant numbers). Berkett testified that there are 2,000 utilization review contractor nurse positions in Oregon. The district court therefore properly concluded that there is substantial evidence in the record to support the finding that Mickelson–Wurm can perform jobs which exist in significant numbers in the economy.

**AFFIRMED.**

---

* The Honorable Kent J. Dawson, United States District Judge for the District of Nevada, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3.